IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>      Plaintiff,<br><br> vs.<br><br>STANLEY J. KOWALEWSKI And SJK INVESTMENT MANAGEMENT, LLC<br><br>      Defendants. | CIVIL ACTION NO. 1:11-cv-0056-TCB |

## RECEIVER'S FIRST INTERIM REPORT

S. Gregory Hays ("Receiver"), the court-appointed Receiver for Stanley J. Kowalewski ("Kowalewski") and SJK Investment Management, LLC ("SJK"), files his First Interim Report showing the Court as follows:

## INTRODUCTION

1.      This action involves five hedge funds and other investment accounts created and managed by SJK and Kowalewski.  There are 16 distinct investors in

these funds, including several pension plans.[1]  Several of the investors are affiliated with SJK, including Kowalewski, individually.

2.     In addition to the five hedge funds, SJK was an investment adviser and money manager for the Georgia Ports Authority.  As more fully explained below, the monies invested by the Georgia Ports Authority were never included in any of the SJK hedge funds and were managed separately by SJK using discrete investment accounts.

3.     Four of the SJK hedge funds were created as "funds of funds," which, in effect, means that these four funds invested in other hedge funds.  These four funds are:  (1) the SJK Absolute Return Fund Ltd. (the "Offshore Absolute Return Fund"), which was created in 2009; (2) the SJK Absolute Return Fund LLC (the "Onshore Absolute Return Fund"), which was created in 2009; (3) the SJK Long/Short Equity Fund Ltd. (the "Offshore Long/Short Equity Fund"), which was created in 2010; and, (4) the SJK Long/Short Equity Fund LLC (the "Onshore Long/Short Equity Fund"), which was created in 2010.

---

[1] The Receiver does not know the exact number of members of each of the pension plans, which include the pension plans for Sea Island (now the Pension Benefit Guaranty Corp.), St. Joseph's Hospital/Candler Health Systems, and Hickory Springs.

4.      In late 2009, SJK and Kowalewski formed the SJK Special Opportunities Fund LP (the "Special Opportunities Fund") (collectively, with the other four funds, the "SJK Funds").  Between December 31, 2009, and January 3, 2011, SJK directed approximately $16.7 million from the Offshore Absolute Return Fund and the Onshore Absolute Return Fund to the Special Opportunities Fund.  The monies directed to the Special Opportunities Fund were used for various purposes, including paying the operating expenses of SJK (including salary, bonuses, and other payments to Kowalewski and other SJK employees), purchasing a beach house, and investing in a variety of other real estate and business ventures.

5.      On January 6, 2011, the Securities and Exchange Commission (the "SEC") filed this action seeking temporary, preliminary, and permanent injunctive relief, as well as disgorgement and other monetary sanctions.  On that same date, this Court entered an Order to Show Cause, Temporary Restraining Order, Order Freezing Assets, Order Requiring an Accounting, Order Prohibiting Destruction of Documents and Order Expediting Discovery (the "TRO").

6.      On January 21, 2011, the SEC filed an Expedited Motion to Appoint Receiver.  On February 2, 2011, this Court granted the SEC's motion and entered an Order Appointing Receiver and Continuing Asset Freeze (the "Receivership

<u>Order</u>").  In sum, the Receivership Order provides that S. Gregory Hays is Receiver for Kowalewski and SJK and defines the "<u>Receiver Estate</u>" as "Defendants Kowalewski and SJK and their assets."  Among other things, the Receivership Order authorizes and directs the Receiver to:

- take custody, control, and possession of all records, assets, and other property of the Receiver Estate;

- conduct the business operations of Defendants, including the continuation or termination of employment arrangements and all other aspects of any active business operation;

- administer the assets of the Receiver Estate, including the authority to liquidate assets;

- perform an accounting of the receipt, disposition, and use of the subject investment proceeds; and

- investigate any matters that the Receiver deems appropriate in connection with the Receiver Estate.

7.     The Court also directed the Receiver "to file with the Court and serve upon the parties within 30 days after [February 2, 2011], a preliminary report setting out the identity, location, and value of the known assets of the Receivership, and any liabilities pertaining thereto."

8.     Pursuant to the terms of the Receivership Order, the Receiver employed the following professionals:

- Hays Financial Consulting, LLC, of Atlanta, Georgia ("HFC"), to serve as accountants, forensic examiners, and financial consultants to the Receiver; and,

- Troutman Sanders LLP of Atlanta, Georgia, to serve as counsel for the Receiver.

As a result, the Receiver has had a team of professionals, including attorneys, Certified Public Accountants, and Certified Fraud Examiners, working with him in the administration of the receivership and in the conducting of this investigation. (The Receiver and these professionals are collectively referred to below as the "Receiver Team.")

9.    This First Interim Report is intended to provide preliminary information regarding:  the assets and liabilities of the Receiver Estate; the structure of the SJK Funds; a summary of the Receiver's activities to date; the Receiver's plan for managing and liquidating the investments and returning money to investors; and other available information regarding the investments created and managed by SJK and Kowalewski.  As indicated below, the Receiver Team has gained a good understanding of the structure of the SJK Funds and has taken steps to assure the structure and operations are secure as investors are redeemed.  Even so, it is important to emphasize that this report contains a preliminary assessment and is based upon facts currently known to the Receiver Team.  As additional facts are discovered, it is possible that the information provided below will be

determined to be incorrect or, more likely, incomplete.  The asset values reported likely will change consistent with market values and fluctuations prior to their liquidation.

## OVERVIEW OF THE RECEIVER'S ACTIVITIES

10.    With the entry of the Receivership Order on February 2, 2011, the Receiver Team immediately began to take control of the Receiver Estate.

11.    On February 3, 2011, the Receiver and other members of the Receiver Team from HFC took control of SJK's offices in Greensboro, North Carolina and began working with Kowalewski and the other remaining employees to understand the business and begin to wind down SJK.  The Receiver and/or other members of the Receiver Team were in Greensboro on February 3rd and 4th, and February 7th through 9th.  As a part of this activity, the Receiver Team has accomplished the following:

- Interviewed and established channels of communication with Kowalewski and certain of SJK's employees;

- Terminated SJK's employees and closed the Greensboro, NC office;

- Taken control of SJK's books and records and moved them to Atlanta;

- Taken possession of and imaged SJK's computers and related servers;

- Visited most of the real properties and sites of other business ventures that received investment from or through SJK and the Special Opportunities Fund;

- Engaged in negotiations with the office landlord and other of SJK's creditors in an effort to reduce SJK's liabilities;

- Worked on a plan to liquidate the Special Opportunities Fund's investments;

- Met with other members of limited liability companies in which the Special Opportunities Fund owns an interest; and

- Worked on an accounting of the sources and uses of funds of the Receiver Estate.

12.    Upon the Receiver's appointment, the Receiver Team contacted each investor by telephone and then furnished an explanatory memorandum to investors (other than insiders and former employees of SJK).  In the ensuing weeks, there has been additional communication with many of these investors and/or their counsel.

13.    Since the Receiver's appointment, the Receiver's attorneys have devoted significant time and effort to analyzing the structure, governance, and operation of the SJK Funds.  In this regard, Receiver's counsel has:

- Contacted each of the 11 third-party hedge fund managers, as well as several banks and other financial institutions;

- Reviewed and analyzed the various agreements relevant to the formation, governance, and operation of the SJK Funds – e.g.,

limited partnership agreements, operating agreements, subscription agreements, and private placement memoranda;

- Consulted with existing Cayman Islands' counsel about various issues regarding the Offshore Absolute Return Fund and the Offshore Long/Short Equity Fund, including compliance with Cayman Islands laws and regulations;

- Engaged in preliminary interviews of some of the professionals that provided services to SJK or the SJK hedge funds;

- Reviewed various agreements between SJK, the SJK Funds, and third parties to determine the rights and obligations of the parties thereunder;

- Worked with the financial professionals to establish a plan for the orderly and efficient liquidation of various assets of the Special Opportunities Fund; and

- Filed the Receivership Order in various jurisdictions and took other actions necessary to preserve the assets of the Receiver Estate.

14.     With the entry of the TRO, this Court froze the Defendants' assets and monies subject to their direct or indirect control.  The SEC served the TRO on various financial institutions.  Following the Receiver's appointment, the Receiver Team served notice of his appointment and the continuation of the asset freeze upon the following banks, brokerage firms and financial institutions, and other entities:

**<u>Fund Managers:</u>**

- AlphaBet Management LLC

- Artis Capital Management

- Ascend Capital LLC

- Bryn Mawr Capital Management, Inc.

- Carlson Capital L.P.

- Glazer Capital Management

- Madison Street Partners LLC

- Manalapan Oracle Advisers LLC

- Rivanna Capital LLC

- SES Partners

- SG Capital Management LLC

**<u>Banks and Financial Institutions</u>:**

- Bank of Oak Ridge

- BNP Paribas

- First Citizens Bank

- Goldman, Sachs & Co.

- JP Morgan Chase Bank NA

- NewBridge Bank

- RYDEX-SGI

- SunTrust Bank

- Wachovia Bank

**Other Entities**:

- J. Destiny Inc.

- JBF Entertainment, LLC

- Jones Computer and Networking

- Pawleys Island Realty

- Sport Performance Training, LLC

15.     In addition to Kowalewski and SJK's former employees, the Receiver and/or his counsel have interviewed, either in person or by telephone, various individuals who had a business relationship with Kowalewski and/or SJK.

16.     As a result of these and other activities, the Receiver Team believes that it has gained a good understanding of the facts and issues that will be most critical to the effective administration of this receivership, many of which are set forth in this Report.

17.     At this early stage, it is difficult to predict how long it will take for the Receiver to complete his work.  As the receivership moves forward, the Receiver

Team will continue its efforts to most efficiently recover and realize the value of assets for the benefit of the Receiver Estate.

## THE SJK FUNDS

18.     At the time of the Receiver's appointment, SJK acted as the investment manager for each of the SJK Funds.  Each SJK Fund is a distinct legal entity with its own governance structure.  The two Offshore Funds are Cayman Islands' Exempted Companies.  The two Onshore Funds are Delaware Limited Liability Companies.  And the Special Opportunities Fund is a Delaware Limited Partnership.

19.     Most of SJK's investors made direct investments in one or both of the Onshore and Offshore Absolute Return Funds, with those Funds then investing in third-party hedge funds, the two Long/Short Equity Funds, and the Special Opportunities Fund.  The total combined investment in the two Absolute Return Funds and two Long/Short Equity Funds was $77,963,747.  Excluding these funds' investments in the Special Opportunities Fund, which, as described below, is difficult to value at this time, the total reported value of the assets under management of these four funds as of January 31, 2011 was approximately $64,335,037.  A detailed description of each of the hedge funds, its investors, and assets is set forth below.

20.     Until January 31, 2011, SS&C Technologies Inc. ("SS&C") provided various administration services for the Onshore and Offshore Absolute Return Funds and Onshore and Offshore Long/Short Equity Funds.  These services included, among other things:  reconciling portfolio positions and cash balances; maintaining books and records; calculating and accruing all income and expenses, including management and incentive fees; calculating gains and losses; preparing various management reports; operating bank accounts as directed by SJK; processing subscriptions and redemptions; and various other tasks.  SS&C terminated its agreements with these four SJK Funds on January 31, 2011.  Given SS&C's extensive background in providing these fund administration services, the Receiver Team is working to enter into new agreements between these four SJK Funds and SS&C so that SS&C can continue providing these services.  Once the agreements are in place and the Receiver Team is working with SS&C, the Receiver Team will be able to better verify the information provided in this Report.

## SJK Absolute Return Fund, Ltd (Offshore)

21.     ***Organization/Corporate Governance.***  The SJK Absolute Return Fund, Ltd. – the Offshore Absolute Return Fund – is a Cayman Islands' Exempted Company.  It was formed on July 28, 2009.  At the time the Receivership Order was entered, the Offshore Absolute Return Fund had two directors serving on its

Board of Directors:  Kowalewski and David Bree (who is employed by dms Corporate Management Services, Ltd., a Cayman Islands' company).  The day-to-day affairs of the Offshore Absolute Return Fund, including all investment decisions, were managed by SJK pursuant to a July 29, 2009 Investment Advisory Agreement between the Fund and SJK.  Investors made their investments in exchange for shares.

22.     ***Current Status/Governance Structure.***  The corporate structure of the Offshore Absolute Return Fund remains intact and the Receiver, through SJK, has the authority to manage the day-to-day operations of the Fund.  Moreover, Kowalewski recently resigned from the Board of Directors of the Fund and the Receiver is now serving on the Board.  Finally, the Receiver Team is working with Cayman Islands' counsel to ensure continued compliance with Cayman Island laws and regulations.

23.     ***Investors.***  The Offshore Absolute Return Fund has five investors, which invested a total of $48,759,820.93.  Listed below is each investor's total investment in the Fund:[2]

---

[2] The Receiver intends to work with SS&C to determine the percentage ownership of each investor in each of the SJK Funds.  Though dividing an individual investor's investment by the total amount invested in a Fund provides an approximate percentage of ownership, the price per share or, if applicable limited

a.   <u>Amended and Restated Hickory Springs Retirement Plan</u>:
$7,000,000.

b.   <u>GeeChee Reinsurance Company, LLC</u>:  $5,425,900.

c.   <u>Sea Island Resort (Pension Benefit Guaranty Corp.)</u>:
$8,653,674.

d.   <u>St. Joseph's/Candler Funded Depreciation</u>:  $21,317,557.

e.   <u>St. Joseph's/Candler Health Systems, Inc. Retirement Plan</u>:
$6,362,690.

24.   ***Assets as of January 31, 2011 Invested with Third-Party Funds.***

The Offshore Absolute Return Fund invested in the following third-party funds,

which have reported asset values as of January 31, 2011 as indicated:

**<u>Carlson Capital L.P.</u>**

| Fund | Amount Invested | 1/31/11 Value |
|------|-----------------|---------------|
| Black Diamond Arbitrage Ltd | $2,048,948 | $2,256,704 |
| Black Diamond Relative Value, Ltd | $3,611,472 | $3,809,494 |
| Double Black Diamond, Ltd | $4,663,654 | $5,423,116 |

**<u>Madison Street Partners LLC</u>**

| Fund | Amount Invested | 12/31/10 Value |
|------|-----------------|----------------|
| Madison Street Partners LLC | $5,000,000 | $5,184,687 |

partnership interest, of a Fund fluctuates over time based upon the total assets of
the fund.  Thus, an investor's ownership interest was determined as of the date of
investment based upon the value of the fund.  While the amount invested by each
investor compared to the total investments in the Fund is a guide, this does not
yield an accurate percentage of ownership.

25.     ***Assets Invested with the Offshore Long/Short Equity Fund.***  The Offshore Absolute Return Fund invested $19,313,183 in the Offshore Long/Short Equity Fund.

26.     ***Other Assets.***  The Offshore Absolute Fund is holding $291,937 in cash in an account at JP Morgan Chase Bank, as of January 31, 2011.

27.     ***Transfers to/Investments in Special Opportunities Fund.***  The Offshore Absolute Return Fund made nine transfers to the Special Opportunities Fund, totaling, $13,273,024.  The dates and amounts of the transfers are:

| Date | Amount |
|------|--------|
| 12/31/09 | $175,000 |
| 02/01/10 | $1,780,000 |
| 02/26/10 | $300,000 |
| 03/31/10 | $300,000 |
| 05/03/10 | $3,500,000 |
| 05/28/10 | $240,000 |
| 06/29/10 | $800,000 |
| 09/30/10 | $5,378,024 |
| 01/03/11 | $800,000 |
|  | $13,273,024 |

28.     ***Authorized Fees and Expenses***.  The Offshore Absolute Return Fund is responsible for the payment of various fees and expenses, each of which is described below.

a.      ***Fees Paid Directly to SJK.***  The Offshore Absolute Return Fund paid SJK (as Investment Advisor to the Fund) two types of fees:  a management fee and an incentive fee.  The management fee is calculated on a monthly basis and is equal to 1/12 of 1% of the net asset value of each series of each class of shares in the Fund.  The incentive fee is calculated on an annual basis and, in effect, is equal to 10% of any increase in the net asset value of the shares over the course of a fiscal year.[3]  From July 2009 through January 2011, the Fund paid SJK at least $545,000 in total incentive and management fees.  Management fees and, if appropriate, incentive fees will continue to be paid going forward.

b.      ***Fees and Expenses Paid to Third-Party Fund Managers.***  In addition to the above-referenced fees paid by the Fund directly to SJK, the Fund managers that manage the third-party funds in which the Offshore Absolute Return Fund's assets are invested also charge management fees, incentive fees, and certain fund expenses.  These additional management fees, incentive fees, and expenses are paid from the assets invested in these separate investment funds.  Third-party fund manager management fees, incentive fees, and expenses will continue to be

---

[3] The method for calculating the incentive fee is somewhat complex and subject to some interpretation; however, the Receiver believes it was intended to be calculated, and was actually calculated, as described above.

paid in the ordinary course until all investments managed by a particular fund

manager are redeemed.

        c.     ***Other Fees and Expenses.***  The Fund also is obligated to pay a

number of other fees and expenses, including:

- Organization expenses, including "start-up expenses;"

-  Transactional expenses, such as brokerage commissions;

- Administrative expenses, including the cost of day-to-day activities such as investor communications, maintenance of bank accounts, preparation of statements, etc.;

- Custodial expenses;

- Legal fees and expenses;

- Audit and accounting fees and expenses;

- Tax preparation fees and expenses;

- Insurance;[4] and

- Miscellaneous expenses.

The total amount of these other fees and expenses paid by the Fund from its

formation through January 31, 2011, was approximately $187,000.  Though some

of these expenses will not be incurred going forward, several, including

---

[4] The Fund carried a general liability policy, but does not appear to have purchased directors and officers coverage, errors and omission coverage, a fidelity bond, or other similar policies.

administrative expenses (*e.g.,* SS&C's fees), custodial expenses, legal and accounting fees and expenses, and tax preparation fees and expenses likely will continue to be incurred and paid by the Fund.

### SJK Absolute Return Fund LLC (Onshore)

29.     ***Organization/Corporate Governance.***  The SJK Absolute Return Fund LLC – the Onshore Absolute Return Fund – is a Delaware Limited Liability Company.  It was formed on July 6, 2009.  At the time the Receivership Order was entered, SJK was the sole Managing Member of the Onshore Absolute Return Fund pursuant to the Fund's July 8, 2009 Limited Liability Company Agreement. As the Onshore Absolute Return Fund's Managing Member, SJK had the exclusive authority to conduct the business of the Fund, including complete control over the Fund's investments.  Investors made their investments in exchange for non-managing membership interests.  Investors' interests with the Fund are held in accounts referred to as Non-Managing Member Capital Accounts.

30.     ***Current Status/Governance Structure.***  The corporate structure of the Onshore Absolute Return Fund remains intact and the Receiver, through SJK, continues to act as the Managing Member of the Fund.

31.   *Investors.*  The Onshore Absolute Return Fund had 11 investors, which invested a total of $21,025,902.  Listed below is each investor's total investment in the Fund:

      a.      Brandon Smith and Mishanagqus Mills Smith:  $10,000.

      b.      Community Foundation for NE Georgia:  $4,223,259.

      c.      Ernest V. Montford TTEE Montford Associates PS Trust:  $216,497.

      d.      Fieldale Farms Corp.:  $6,537,843.

      e.      Holy Family Hospital of Bethlehem Foundation:  $1,142,156.

      f.      Resort Hotels Insurance Company:  $675,803.

      g.      Savannah Country Day School:  $1,329,741.

      h.      SJK Investment Management LLC 401(k) Plan:  $64,133.

      i.      Shelter Bay Fund, LP:  $600,000.

      j.      Stanley Kowalewski:  $700,000.

      k.      Tallulah Falls School:  $5,526,441.

32.   ***Assets as of January 31, 2011 Invested with Third-Party Funds.***
The Onshore Absolute Return Fund invested in the following third-party funds, which reported asset values as of January 31, 2011, as indicated:

**Carlson Capital L.P.**

| Fund | Amount Invested | 1/31/11 Value |
|------|-----------------|---------------|
| Black Diamond Arbitrage Partners, LP | $768,350 | $840,093 |
| Black Diamond Relative Value LP | $1,826,141 | $1,935,636 |
| Double Black Diamond, LP | $2,217,474 | $2,526,138 |

**Madison Street Partners LLC**

| Fund | Amount Invested | 1/31/11 Value |
|------|-----------------|---------------|
| Madison Street Fund LP | $1,600,000 | $1,675,543 |

33.     ***Assets Invested with the Onshore Long/Short Equity Fund.***  The Onshore Absolute Return Fund also invested $10,041,204 in the Onshore Long/Short Equity Fund.

34.     ***Other Assets***.  The Onshore Absolute Fund is holding $853,084 in cash in an account at JP Morgan Chase Bank, as of January 31, 2011.

35.     ***Transfers to/Investments in Special Opportunities Fund***.  The Onshore Absolute Return Fund made net transfers to the Special Opportunities Fund, totaling, $3,378,000.  The dates and amounts of the transfers are:

| Date | Amount |
|------|--------|
| 12/31/09 | $240,000 |
| 01/29/10 | $200,000 |
| 02/01/10 | $1,210,000 |
| 03/31/10 | $628,000 |
| 06/01/10 | $1,450,000 |
| 09/03/10 | $250,000 |
| 10/01/10 | ($200,000) |
| 11/05/10 | ($1,000,000) |
| 01/03/11 | $600,000 |

$3,378,000

36. ***Authorized Fees and Expenses.*** The Onshore Absolute Return Fund's authorized fees and expenses are similar to those of the Offshore Absolute Return Fund, described above in Paragraph 28. From its formation through January 31, 2011, the Onshore Absolute Return Fund paid management and incentive fees of at least $223,000 to SJK and also paid management and incentive fees to third-party fund managers. The Onshore Absolute Return Fund also incurred and paid "other" fees and expenses totaling approximately $119,000. As with the Offshore Absolute Return Fund, although some of these fees and expenses will be reduced or eliminated going forward, the Fund will continue to pay several categories of these fees and expenses going forward.

## SJK Long/Short Equity Fund Ltd. (Offshore)

37.     ***Organization/Corporate Governance.***  The SJK Long/Short Equity Fund Ltd. – the Offshore Long/Short Equity Fund – is a Cayman Islands' Exempted Company.  It was formed on June 11, 2010.  At the time the Receivership Order was entered, the Offshore Absolute Return Fund had two directors serving on its Board of Directors:  Kowalewski and David Bree (who is employed by dms Corporate Management Services, Ltd., a Cayman Islands' company).  The day-to-day affairs of the Offshore Absolute Return Fund, including all investment decisions, were managed by SJK pursuant to an Advisory Agreement between the Fund and SJK dated July 1, 2010.  Investors made their investments in exchange for shares.

38.     ***Current Status/Governance Structure.***  The corporate structure of the Offshore Long/Short Equity Fund remains intact and the Receiver, through SJK, has the authority to manage the day-to-day operations of the Fund.  Moreover, Kowalewski recently resigned from the Board of Directors of the Fund and the Receiver is now serving on the Board.  Finally, the Receiver Team is working with Cayman Islands' counsel to ensure continued compliance with Cayman Islands laws and regulations.

39.   **Investors.**  The Offshore Long/Short Equity Fund has three investors, which invested a total of $26,911,206.65.  Listed below is each investor's total investment in the Fund:

> a.   GeeChee Reinsurance Company, LLC:  $2,460,372.
>
> b.   St Joseph's/Chandler Funded Depreciation:  $5,217,652.
>
> c.   Offshore Absolute Return Fund:  $19,313,183.

40.   ***Assets as of January 31, 2011 Invested with Third-Party Funds.*** The Offshore Long/Short Equity Fund invested all of its funds available for investment in the following third-party funds, which have reported asset values as of January 31, 2011 as indicated:

Alphabet Management LLC.

SJK's records indicate that $2,150,000 was invested from the Offshore Long/Short Equity Fund with Alphabet Management.  Alphabet Management has informed the Receiver that this amount was frozen prior to its investment in an Alphabet Management fund and that it remains frozen in an Alphabet account at JP Morgan Chase.  The January 31, 2011 value is $2,150,167.

**Artis Capital Management**

| Fund | Amount Invested | 1/31/11 Value |
|------|-----------------|---------------|
| Artis Partners 2X Ltd | $1,700,000 | $1,955,443 |

## Ascend Capital LLC

| Fund | Amount Invested | 1/31/11 Value |
|------|-----------------|---------------|
| Ascend Partners Fund II, Ltd | $3,700,000 | $3,857,196 |

## Bryn Mawr Capital Management, Inc.

| Fund | Amount Invested | 1/31/11 Value |
|------|-----------------|---------------|
| Rosemont Offshore Fund, Ltd | $1,800,000 | $2,034,614.79 |

## Glazer Capital Management

| Fund | Amount Invested | 1/31/11 Value |
|------|-----------------|---------------|
| Glazer Enhanced Offshore Fund Ltd | $2,775,000 | $2,805,439 |

## Manalapan Oracle Advisers LLC

| Fund | Amount Invested | 1/31/11 Value |
|------|-----------------|---------------|
| Manalapan Oracle Eagle Offshore Fund, Ltd | $4,935,000 | $5,343,244 |

## Rivanna Capital LLC

| Fund | Amount Invested | 1/31/11 Value |
|------|-----------------|---------------|
| Rivanna Offshore Partners Ltd | $4,791,073 | $5,026,033 |

## SES Partners

| Fund | Amount Invested | 1/31/11 Value |
|------|-----------------|---------------|
| SES Offshore Ltd | $1,255,000 | $1,217,949 |

## SG Capital Management LLC

| Fund | Amount Invested | 1/31/11 Value |
|------|-----------------|---------------|
| Cedar Street Offshore Fund Ltd | $3,500,000 | $3,864,847 |

41.   ***Other Assets.***  The Offshore Long/Short Equity Fund is holding

$106,023.04 in cash in an account at JP Morgan Chase Bank, as of January 31,

2011.

42.   ***Transfers to/Investments in Special Opportunities Fund.***  The

Offshore Long/Short Equity Fund did not make any transfers to the Special

Opportunities Fund.

43.   ***Authorized Fees and Expenses.***  The Offshore Long/Short Equity

Fund's authorized fees and expenses are substantially similar to those of the

Offshore Absolute Return Fund, described above in Paragraph 28; however, the

Offshore Long/Short Equity Fund pays monthly management fees equal to 1/12 of

1.5% of the net asset value of each series of each class of share in the Fund.  From

its formation through January 31, 2011, the Offshore Long/Short Equity Fund did

not pay management and incentive fees to SJK.  The Offshore Long/Short Equity

Fund also incurred and paid "other" fees and expenses totaling approximately

$99,000.  As with the other SJK Funds, although some of these fees and expenses

will be reduced or eliminated going forward, the Fund will continue to pay several

categories of these fees and expenses going forward.

## SJK Long/Short Equity Fund LLC (Onshore)

44.    ***Organization/Corporate Governance.***  The SJK Long/Short Equity Fund LLC – the Onshore Long/Short Equity Fund – is a Delaware Limited Liability Company.  It was formed on June 18, 2010.  At the time the Receivership Order was entered, SJK was the sole Managing Member of the Onshore Long/Short Equity Fund pursuant to the Fund's July 1, 2010 Limited Liability Company Agreement.  As the Onshore Long/Short Equity Fund's Managing Member, SJK had the exclusive authority to conduct the business of the Fund, including complete control over the Fund's investments.  Investors made their investments in exchange for non-managing membership interests.  Investors' interests with the Fund are held in accounts referred to as Non-Managing Member Capital Accounts.

45.    ***Current Status/Governance Structure.***  The corporate structure of the Onshore Long/Short Equity Fund remains intact and the Receiver, through SJK, continues to act as the Managing Member of the Fund.

46.    ***Investors (Percentage Ownership).***  The Onshore Long/Short Equity Fund had two investors, which invested a total of $10,541,204.  Listed below is each investor's total investment in the Fund:

a.    <u>Onshore Absolute Return Fund</u>:  $10,041,204.

      b.   <u>Stanley Kowalewski</u>: $500,000.  (The Receiver's analysis regarding the source of this $500,000 investment is ongoing.)

47.    ***Assets as of January 31, 2011 Invested with Third-Party Funds.***

The Onshore Long/Short Equity Fund invested all of its funds available for investment in the following third-party funds, which have reported asset values as of January 31, 2011 as indicated:

      a.   *Alphabet Management LLC.*  SJK's records indicate that $250,000 was invested from the Offshore Long/Short Equity Fund with Alphabet Management.  Alphabet Management has informed the Receiver that this amount was frozen prior to its investment in an Alphabet Management fund and that it remains frozen in an Alphabet account at JP Morgan Chase. The January 31, 2011 value is $250,027.

### Artis Capital Management

| Fund | Amount Invested | 1/31/11 Value |
|------|-----------------|---------------|
| Artis Partners 2X LP | $1,000,000 | $1,137,965 |

### Ascend Capital LLC

| Fund | Amount Invested | 1/31/11 Value |
|------|-----------------|---------------|
| Ascend Partners Fund II LP | $1,500,000 | $1,555,342 |

### Bryn Mawr Capital Management, Inc.

| Fund | Amount Invested | 1/31/11 Value |
|------|-----------------|---------------|
| Bryn Mawr Capital, LP | $1,600,000 | $1,719,217 |

### Glazer Capital Management

| Fund | Amount Invested | 1/31/11 Value |
|------|-----------------|---------------|
| Glazer Enhanced Fund, LP | $250,000 | $252,637 |

### Manalapan Oracle Advisers LLC

| Fund | Amount Invested | 1/31/11 Value |
|------|-----------------|---------------|
| Manalapan Oracle Eagle Fund LP | $2,450,000 | $2,605,838 |

### Rivanna Capital LLC

| Fund | Amount Invested | 1/31/11 Value |
|------|-----------------|---------------|
| Rivanna Partners LP | $1,956,373 | $2,055,725 |

### SES Partners

| Fund | Amount Invested | 1/31/11 Value |
|------|-----------------|---------------|
| SES Partners LP | $250,000 | $242,142 |

### SG Capital Management LLC

| Fund | Amount Invested | 1/31/11 Value |
|------|-----------------|---------------|
| Cedar Street Fund LP | $1,200,000 | $1,309,875 |

48.     *Other Assets.*  The Onshore Long/Short Equity Fund is holding $48,880.32 in cash in an account at JP Morgan Chase Bank, as of January 31, 2011.

49.     *Transfers to/Investments in Special Opportunities Fund.*  The Onshore Long/Short Equity Fund did not make any transfers to the Special Opportunities Fund.

50.   ***Authorized Fees and Expenses.***   The Onshore Long/Short Equity Fund's authorized fees and expenses are substantially similar to those of the Offshore Absolute Return Fund, described above in Paragraph 28; however, the Onshore Long/Short Equity Fund pays monthly management fees equal to 1/12 of 1.5% of the net asset value of each series of each class of share in the Fund.  From its formation through January 31, 2011, the Onshore Long/Short Equity Fund did not pay management and incentive fees to SJK.  The Onshore Long/Short Equity Fund also incurred and paid "other" fees and expenses totaling approximately $41,000.  As with the other SJK Funds, although some of these fees and expenses will be reduced or eliminated going forward, the Fund will continue to pay several categories of these fees and expenses going forward.

## SJK Special Opportunities Fund, LP

51.   ***Organization/Corporate Governance.***   The SJK Special Opportunities Fund, LP is a Delaware Limited Partnership.  It was formed on November 30, 2009.  The General Partner of the Special Opportunities Fund is SK General Partner, LLC, which, in turn, was managed by Kowalewski as its Managing Member.  Thus, as the Managing Member of the Special Opportunities Fund's General Partner, Kowalewski exercised complete control over the Fund. Investors made investments in exchange for limited partnership interests.

52.    ***Current Status/Governance Structure.***   The structure of the Special Opportunities Fund remains intact, with the Receiver operating the Fund as Receiver for Kowalewski, who is the managing member of SK General Partner LLC, which, in turn, is the General Partner of the Special Opportunities Fund. Contemporaneously with the filing of this Report, however, the Receiver has filed a motion seeking to have the Special Opportunities Fund placed into receivership.

53.    ***Investors.***   The investors in the Special Opportunities Fund were the Offshore Absolute Return Fund – $13,273,024 – and the Onshore Absolute Return Fund – $3,378,000.  As indicated above, these two Funds were managed by SJK. Unlike the other SJK Funds, no investments were solicited or received from third-party investors.  Moreover, based on the Receiver Team's communications with each of the investors in the other SJK Funds, it appears that none of the outside investors in the other SJK Funds knew of the Special Opportunities Fund or were provided with the Fund's Private Offering Memorandum.

54.    ***Other Sources of Cash.***   Other than the investments of the Onshore and Offshore Absolute Return Funds, the Special Opportunities Fund also received $1.7 million from Kowalewski, as well as approximately $181,000 in rental income and interest income.  The Receiver's analysis regarding the source of the $1.7 million in transfers from Kowalewski is ongoing.  Further, it is unclear

whether this $1.7 million was paid in exchange for limited partnership units, in which case Kowalewski would be an investor in the Fund, or if the $1.7 million was paid to reimburse the Fund for certain expenses.

55.    ***Uses of Cash.***  The cash in the Special Opportunities Fund was used for various purposes.  More than half – $10,025,000 – was paid to SJK: $8,025,000 in "Administrative Fees" and $2 million in "Incentive Fees."[5]  The remaining $6.98 million was used to purchase a beach house and invest in real estate developments and other ventures.  The table below shows the Special Opportunities Fund sources and uses of cash:

---

[5] As described in Paragraphs 63 and 67 below, SJK paid Kowalewski $7,952,896.98 of this amount, the rest went to pay SJK's employee salaries, operating expenses, etc.

**Sources of Cash:**

| | | | |
|---|---|---|---|
| Offshore SJK Absolute Return Fund | $ | 13,273,024.00 | |
| Onshore SJK Absolute Return Fund | | 3,378,000.00 | |
| Stan Kowalewski | | 1,700,000.00 | $ 18,351,024.00 |
| | | | |
| Rental Income | | | 141,816.68 |
| Interest Income (Combs) | | | 39,600.00 |
| **Total Sources of Cash** | | | $ 18,532,440.68 |

**Uses of Cash:**

| | | | |
|---|---|---|---|
| Transfers to SJK | $ | 10,025,000.00 | |
| Combined Operating Expenses* | | 89,058.27 | $ 10,114,058.27 |
| | | | |
| CDLD (McNairy Pointe) | | | 1,150,843.00 |
| McNeely Pointe | | | 300,000.00 |
| Pawley's Island | | | 4,110,216.54 |
| Velocity Sports | | | 225,000.00 |
| J. Destiny | | | 343,500.00 |
| KSTSO | | | 250,350.00 |
| Loan to Combs | | | 600,000.00 |
| **Total Uses of Cash** | | | $ 17,093,967.81 |

| | | |
|---|---|---|
| **Ending Cash 01.31.11** | $ | 1,438,472.87 |

*Includes: insurance, maintenance, utilities, commissions & fees, and all other expenses

As described in more detail below, other than the Pawley's Island beach house, the $1.4 million in cash, and the $250,000 recovered in connection with KSTSO, the Receiver does not anticipate recovering all of the amounts invested by the Special Opportunities Fund.

56.     ***Assets as of January 31, 2011.***  The Special Opportunities Fund's current assets are:

a.     ***Pawley's Island Beach House.***  On May 6, 2010, the Special Opportunities Fund purchased a house on Pawley's Island, South Carolina for a purchase price of $3,900,000.  After purchasing the property, the Special Opportunities Fund spent approximately $200,000 in property improvements.  The Receiver has ordered an appraisal on the property and intends to list the property for sale at its current market value.  In 2010, the Pawley's Island property earned $141,816.68 in rental revenue or receipts.  The Receiver intends to continue to rent the property until it is sold.

b.     ***Cash.***  At the time of the appointment of the Receiver, $1,438,472.87 was on deposit in a Special Opportunities Fund account at First Citizens Bank.  The Receiver has secured the transfer of this entire amount to an account under his control.

c.     ***KSTSO Holdings LLC – 35% Ownership Interest.***  KSTSO Holdings, LLC ("KSTSO") is a North Carolina LLC formed and owned by the Special Opportunities Fund, which holds a 35% ownership interest; Kowalewski and his wife, Traci, who hold a 35% ownership interest; and Kevan R. Combs ("Combs"), who owns a 30% ownership interest.  The Special Opportunities Fund

invested $350.00 in KSTSO and funded a deposit of $250,000 in an account at First Citizens Bank.  The only substantial disbursement[6] from the account was a $25,000 retainer paid to KSTSO's attorney.

KSTSO has no assets other than the money described above.  KSTSO was formed to pursue a potential land fill project in Rockingham County, North Carolina.  Combs had identified a farm as a potential landfill site and KSTSO was formed to secure Kowalewski's and the Special Opportunities Fund's involvement in the potential project.  KSTSO, however, owns no land and, other than preliminary planning and analysis done by Combs, has performed no work towards developing a landfill.

The Receiver recently secured the return of $224,773.32 in KSTSO's bank account and the $25,000 retainer paid to KSTSO's attorney.  The Receiver does not anticipate any further recoveries related to KSTSO.

       d.     ***CDLD Holdings LLC – 50% Ownership Interest.***  The Special Opportunities Fund owns a 50% membership interest in CDLD Holdings LLC, a North Carolina LLC ("CDLD").  The other members are DKF Holdings LLC

---

[6] The Receiver's analysis shows that on January 10 and 14, 2011, after the issuance of the TRO, a debit card associated with the KSTSO account was used to make purchases of $18.66 and $50.00.  The remainder of the funds were intact prior to the Receiver closing the account.

("DKF"), which owns a 30% membership interest, and Combs, who owns a 20% membership interest.  According to SJK's records, the Special Opportunities Fund invested a total of $1,150,843 in CDLD.

The Receiver's analysis of CDLD is ongoing.  Based on documents reviewed and information obtained from interviews of the other members of CDLD, it appears that CDLD's sole asset is a piece of land known as McNairy Pointe, which has been developed for the construction and sale of individual residential lots.

McNairy Pointe was appraised in early 2010 with a value of $3.1 million in its current condition.  There is an outstanding note to SunTrust Bank in the amount of $3,946,184.26, which is secured by a first lien deed of trust.  Upcoming payment obligations include approximately $15,000 per month in interest payments, taxes, insurance, and other expenses, and a principal reduction payment of $850,000, which is due on April 30, 2011.  In addition to the SunTrust mortgage, DKF and Combs have represented to the Receiver that they have made outstanding loans to CDLD totaling approximately $220,000.

The other members of CDLD are actively marketing the McNairy Pointe property for sale; however, based on all of the foregoing factors the Receiver does

not expect that the Special Opportunities Fund will recover a material portion of its $1,150,843 investment in CDLD.

     e.     ***McNeely Developers LLC – 43.3% Ownership Interest.***  The Special Opportunities Fund owns a 43.3% membership interest in McNeely Developers LLC, a North Carolina LLC ("McNeely LLC").  The other members are DKF, which owns a 33.3% membership interest, and Combs Development LLC ("Combs Development"), which owns a 23.3% membership interest.  According to SJK's records the Special Opportunities Fund invested a total of $300,000 in McNeely LLC.

     The Receiver's analysis of McNeely LLC is ongoing.  Based on documents reviewed and information obtained from interviews of the other members of McNeely LLC, it appears that the company's sole asset is raw land known as McNeely Pointe, which is intended to be a residential real estate development.  McNeely Pointe is located across the street from McNairy Pointe.

     McNeely Pointe was appraised in July 2010 as being worth $1.86 million.  There is an outstanding note to Carolina Bank in the amount of $1,808,800, which is secured by a first lien deed of trust.  This note is mature and the Receiver has been informed by Combs that the debt needs to be reduced by at least $599,800 to meet the bank's 65% loan-to-value restriction.  In addition to the Carolina Bank

mortgage, DKF and Combs have represented to the Receiver that they have made loans in excess of $390,000 to McNeely LLC.

The other members of CDLD are actively marketing the McNeely Pointe property for sale; however, based on all of the foregoing factors the Receiver does not expect that the Special Opportunities Fund will recover a material portion of its $300,000 investment in McNeely LLC.

f.      ***$600,000 Loan to Combs Group, LLC.***  Also listed as an asset of the Special Opportunities Fund is a $600,000 balance on a January 29, 2010 Line of Credit Promissory Note extended by the Special Opportunities Fund to Combs Group, LLC ("Combs Group").  Payment on the Note is guaranteed by Combs and his wife, Susan Combs.  The Special Opportunities Fund and the Combses also entered into a Pledge Agreement whereby the Combses pledged their interest in various entities to the Special Opportunities Fund.  The Receiver continues to analyze the collectability of this debt and the value of the business interests pledged by Combs to secure the debt.

g.      ***Special Opportunity Fund d/b/a Velocity Sports – 100% Ownership Interest.***  On September 1, 2010, the Special Opportunities Fund entered into a Franchise Agreement with Sport Performance Training, LLC, to own

and operate a "Velocity Sports" franchise.  Velocity Sports is a sports performance training facility.

No separate entity was created for Velocity Sports; rather the Special Opportunities Fund operated Velocity Sports as a d/b/a.  SJK's records show that the Special Opportunities Fund invested a total of $225,000 into the franchise.[7]

To date, the Velocity Sports franchise has not generated a profit.  The Receiver recently ceased operations of Velocity Sports and is in the process of liquidating its assets, which the Receiver does not anticipate will generate significant cash for the Receiver Estate.  Sport Performance Training, LLC has not yet claimed, but may claim, that there are outstanding liabilities under the franchise agreement.  Other liabilities, which previously were paid by SJK, include payroll, rent, and prepaid memberships.  These liabilities are included in SJK's liabilities.

h.    ***J. Destiny, Inc. – 50% Ownership Interest.***  J. Destiny, Inc. ("J. Destiny") is a custom clothing retailer that is being built in High Point, North Carolina.  On September 1, 2010, the Special Opportunities Fund entered into a Stock Purchase Agreement with J. Destiny, and James W. Carpenter, Jr., pursuant to which J. Destiny issued 100,000 shares of stock (a 50% ownership interest) to

---

[7] It appears that the ongoing expenses of Velocity Sports, including employee salaries, were paid by SJK, not directly by the Special Opportunities Fund.

the Special Opportunities Fund in exchange for $500,000.  Based on SJK's

records, it appears that the Special Opportunities Fund has paid $343,500 of the

$500,000 called for by the Stock Purchase Agreement.  Having determined that

investment proceeds were transferred to J. Destiny's bank account, the Receiver

has provided that bank with notice of the asset freeze.  The Receiver's

investigation of the J. Destiny transaction continues, including potential returns

and/or liabilities related thereto.

57.   ***Other Properties.***  In addition to the assets included in Paragraph 56,

the Special Opportunities Fund previously owned three other pieces of real

property that it had purchased from Kowalewski.  Kowalewski repurchased all of

these properties from the Fund in 2010.  The Receiver's analysis regarding the

source of funds used for Kowalewski's repurchase is ongoing.

58.   ***Fees and Expenses.***

a.   ***SJK Expenses.***  According to the Private Offering

Memorandum dated August 2010, the Special Opportunities Fund pays its own

expenses along with all of SJK's expenses.  The Fund's expense structure has

changed since the Fund's inception.  In the initial Private Offering Memorandum

issued in January 2010, which was not shared with any of SJK's investors, the

Special Opportunities Fund was required to pay its own expenses, as well as

certain SJK expenses, up to a limit of $500,000 per year.  In a revised Private

Offering Memorandum, issued in August 2010, which also was not shared with

any of SJK's investors, this expense structure was revised to require the Special

Opportunities Fund to pay additional SJK expenses and to remove the $500,000

annual SJK expense limit.  It is under this revised structure that SJK appears to

have made the majority of transfers from the Special Opportunities Fund to SJK

described in Paragraph 55, above.

   b. ***Incentive Fee to SJK.***  In addition to paying all of SJK's

expenses, the Special Opportunities Fund Private Offering Memorandum indicates

that it is required to pay SJK an annual incentive fee calculated as of the last

business day of each fiscal year.  The incentive fee is equal to 20% of the net profit

attributable to each Limited Partner during the year at issue.  On January 3, 2011,

the Special Opportunities Fund paid SJK an incentive fee of $2,000,000 for the

fiscal year 2010.

## GEORGIA PORTS AUTHORITY INVESTMENTS

  59. SJK was an investment advisor and money manager for the Georgia

Ports Authority ("GPA").  However, GPA did not invest in any of the SJK hedge

funds, and it appears that its funds have been administered separately and distinctly

from the hedge fund investments.

60.     SJK's records show that investments made by the GPA were deposited into three brokerage accounts at Goldman Sachs and one brokerage account at BNP Paribas.  The Goldman Sachs accounts appear to have been managed by Madison Street Partners, LLC; Manalapan Oracle Advisors LLC; and Rivanna Capital LLC.  The BNP account was managed by SG Capital Management LLC.  As of January 31, 2011, the combined assets under management in the GPA accounts was $13,544,183.47.

## SJK'S ASSETS AND LIABILITIES

61.     The Receiver's analysis of SJK's assets and liabilities is ongoing.  The following sources and uses analysis is based on currently available information reviewed as of the time of the filing of this Report.

62.     ***Sources of Funds (Management and Incentive Fees).***  From July 2009 through January 2011, SJK received a total of at least $988,388 in management and incentive fees from the various SJK funds and from GPA.

63.     ***Uses of Funds.***  Although the Receiver's investigation and analysis is ongoing, it appears that the vast majority of the funds available to SJK have been disbursed.  While some of the money was used to purchase the assets identified in the "Current Assets" section below, SJK's principal uses of money were as follows:

a.    ***Transfers from SJK to Kowalewski.***  From August 2009 to January 3, 2011, SJK transferred to Kowalewski a total of approximately $7,952,896.98.  Of that total amount, $7,450,000 was characterized as "Member's Draws."  This $7,450,000 was transferred from SJK to Kowalewski from October 15, 2010 to January 3, 2011.

b.    ***SJK's Operating Expenses.***  From July 2009 through January 2011, SJK spent a total of $1,398,032 in operating expenses.  Among other things, SJK included in its calculation of operating expenses its rent, meals and entertainment expenses, cellular telephone plan, and travel.

c.    ***Payroll.***  From July 2009 through January 2011, SJK spent a total of $1,045,419 in payroll expenses for its employees.  In addition, SJK paid bonuses to its employees in 2010.  For several SJK employees, these bonuses equaled 100% of their salaries.  The bonuses paid totaled $482,000.  In the past, SJK also paid the payroll expenses of Velocity Sports, which are included in the amount listed above.

d.    ***Donations to Oak Ridge Military Academy.***  SJK made total combined donations to Oak Ridge Military Academy of $5,090.

e.    ***Purchase of Property.***  SJK purchased a parcel of undeveloped land located at 3674 Oak Ridge Road, Lot #2, Summerfield, NC 27310, on

October 25, 2010, for the purposes of building an office building.  SJK paid

$200,000 to purchase the property.  The Receiver will list the property for sale.

       f.    ***Construction Deposit.***  During 2010, SJK paid Combs

$224,000 as a deposit for the cost of an office building that it intended to have

Combs build on the Oak Ridge Road property discussed above.  The Receiver is in

discussions with Combs regarding a refund of the deposit.

    64.   ***Current Assets.***  The Receiver's investigation into SJK's assets is

ongoing.  To date, the Receiver has identified the assets referenced below as

belonging to SJK.  These estimates are subject to change as the Receiver's

investigation continues, and the Receiver may ultimately recover more or less than

the estimated value of each asset.

       a.    ***Cash.***  SJK's checking account has a balance of $53,997.58.

The Receiver has taken control of these funds.

       b.    ***Real Estate.***  3674 Oak Ridge Road, Lot #2, Summerfield, NC

27310, which was purchased for $200,000.

c.     ***Accounts Receivable.***  SJK will be owed fees from GPA and, possibly, the various SJK Funds[8] on an ongoing basis.  Certain of these fees are currently due and payable.  The Receiver's analysis of SJK's accounts receivable is ongoing.

d.     ***Automobiles.***  SJK owns a 2009 Lexus, which is currently in the possession of Kowalewski.  There is a large loan on the automobile, and the Receiver believes that there is not significant equity in the automobile.

e.     ***Personal Property.***

i.     ***Computers.***  SJK owns a number of computers, a computer server, and a software package.  The Receiver is in possession of this computer equipment and is storing it to preserve the data.  The Receiver might sell this equipment at a later date.

ii.     ***Miscellaneous Property.***  SJK owns a number of miscellaneous items of personal property.  The Receiver will determine whether any of the items are of significant value and, if so, whether the items should be liquidated.

---

[8] At this point, the Receiver does not intend to collect an incentive fee based on the value of the Special Opportunities Fund, as reported by SJK prior to the initiation of the receivership.

65.   ***Current Liabilities.***   The Receiver's investigation into SJK's liabilities is ongoing.  To date, the Receiver has identified the liabilities referenced below as belonging to SJK.

a.   ***Potential Liabilities to the Special Opportunities Fund.***   SJK's operations, disbursements, and other uses of cash were funded primarily from money transferred from the Special Opportunities Fund.  As a result, the Receiver is currently assessing whether some or all of the assets of and recoveries obtained by SJK should be transferred to the Special Opportunities Fund.

b.   ***Payroll Expenses.***   SJK owes approximately $271,556.56 in total payroll expenses, including employee wages for work performed prior to the Receiver's termination of SJK's employees, federal and state withholding, and federal and state payroll taxes.  These expenses are itemized as follows:

i.   Federal Withholding:  $137,427.21

ii.   Federal Payroll Taxes:  $42,093.93

iii.   North Carolina Withholding:  $43,107.00

iv.   North Carolina Payroll Taxes:  $2,214.09

v.   Employee Wages:  $46,714.33

      c.     ***Severance Packages.***  Each SJK employee's employment contract contained a six month severance provision, totaling $281,442.  The Receiver does not presently intend to make any severance payments.  .

      d.     ***Operating Expenses.***  The Receiver is currently aware of $5,201.25 in outstanding operating expenses owed by SJK, but expects this number to change as his investigation continues.  SJK will continue to incur ongoing operating expenses during the course of the receivership.

## KOWALEWSKI'S ASSETS AND LIABILITIES

66.     The Receiver's analysis of Kowalewski's assets and liabilities is ongoing.  The following sources and uses analysis is based on the information reviewed as of the time of this filing**.**

67.     ***Transfers from SJK to Kowalewski.***  From August 2009 to January 3, 2011, SJK transferred to Kowalewski a total of approximately $7,943,218.37.  Of that total amount, $7,450,000 was characterized as a "Member's Draw."  This $7,450,000 was transferred from SJK to Kowalewski from October 15, 2010 to January 3, 2011.

68.     ***Uses of Funds.***  Although the Receiver's investigation into Kowalewski's use of the funds transferred to him by SJK is ongoing, it is the Receiver's belief that Kowalewski has already spent the majority of the funds

transferred to him by SJK.  Some the funds were used to purchase the assets identified in the "Current Assets" section below.  The funds were also used as follows:

a.    ***SJK Funds***.  Kowalewski paid a total of $2.9 million to three of the SJK funds as follows:

i.    ***Special Opportunities Fund.***  Kowalewski paid $1.7 million into the Special Opportunities Fund – $200,000 on November 30, 2010 and $1.5 million on January 4, 2011.  As indicated above, the Receiver continues to analyze whether this was a purchase of a limited partnership interest or repayment of some type.

ii.    ***Onshore Absolute Return Fund.***  Kowalewski invested $100,000 on February 25, 2010; $100,000 on November 30, 2010; and $500,000 on January 4, 2011.

iii.    ***Onshore Long/Short Equity Fund.***  Kowalewski invested $500,000 on January 4, 2011.

b.    ***Real Estate.***  Kowalewski purchased three properties for a combined total of $3,915,000.  Kowalewski later sold one of these properties for $500,000, but it appears that he collected only $399,535 of the purchase price.  The Receiver's investigation into this sale and Kowalewski's use of the purchase

proceeds is ongoing.  The properties Kowalewski currently owns are described more fully in the "Current Assets" section below.

        c.    ***Donations to Oak Ridge Military Academy.***  Since February 2010, Kowalewski made total combined donations to Oak Ridge Military Academy of $471,343.35.

        d.    ***Donations to the Terry J. Fontenot Memorial Foundation.*** Since February 2010, Kowalewski made total combined donations to the Terry J. Fontenot Memorial Foundation of $351,389.40.

        e.    ***Tax Payments.***  In October, 2010, Kowalewski made tax payments totaling $128,162.78 to the U.S. Treasury.

        f.    ***Living Expenses.***  Kowalewski reported in the budget he filed with the Court on January 31, 2011 that his monthly living expenses, which include items such as utilities, car payments, insurance, clothing, and groceries, total $15,590.

69.    ***Current Assets.***  The Receiver's investigation into Kowalewski's assets is ongoing.  To date, the Receiver has identified the assets referenced below as belonging to Kowalewski.  Where possible, the Receiver has included estimates of the assets' values.  These estimates are subject to change as the Receiver's

investigation continues, and the Receiver may ultimately recover more or less than the estimated value of each asset.

        a.    ***Cash.***  Kowalewski has two checking accounts containing a combined total of $97,938.11.  The Receiver has taken control of these funds.  In addition, on January 7, 2011, Kowalewski withdrew from one of his checking accounts $100,000 in a check made payable to "cash."  The Receiver is investigating the uses of this additional $100,000, which was withdrawn after the Court entered its Order freezing Kowalewski's assets on January 6, 2011 (Doc. No. 5).

        b.    ***Real Estate.***

        i.    ***5802 Henson Farms Road, Summerfield, NC.***  This property is jointly owned by Kowalewski and his wife, and it serves as their primary residence.  The Kowalewskis purchased the property from the Special Opportunities Fund on October 21, 2010 for $2,900,000.  In accordance with the terms of the Receivership Order, Kowalewski continues to reside in the house.

        ii.    ***5203 Southwind Road, Greensboro, NC.***  This property is solely owned by Kowalewski.  Kowalewski purchased the property from the Special Opportunities Fund on October 21, 2010 for $315,000.  Kowalewski's parents currently reside in the home.

     c.    **Automobiles.**  Kowalewski owns a 2006 Yukon Denali that is subject to a note for $21,000.  The Receiver estimates the Denali's value at approximately $25,000.

     d.    **Watercraft.**

      i.    **Jet Boat and Trailer.**  Kowalewski owns a 2008 Yamaha Jet Boat and a trailer.  He purchased the boat and trailer for a combined $34,449.  The Receiver intends to sell the boat and trailer.

      ii.    **Carolina Skiff and Trailer.**  Kowalewski owns a 2010 17-foot Carolina Skiff with a 60 HP Outboard Motor and a trailer.  He purchased the boat, motor, and trailer for a combined $17,170.  The Receiver intends to sell the boat and trailer.

      iii.    **Jet Skis and Trailer.**  Kowalewski purchased two 2009 Yamaha Wave Runner jet skis and a trailer on July 1, 2010 for a combined total of $28,637.24.  The Receiver intends to sell the jet skis and trailer.

     e.    **Personal Property.**  The Receiver is taking inventory of Kowalewski's personal property.  The Receiver will determine whether any of the items are of significant value and, if so, whether the items should be liquidated.

     f.    **2009 Tax Refund.**  Kowalewski and his wife requested a 2009 tax refund on their joint return of $12,744.  It is the Receiver's understanding that

the Kowalewskis have not yet received the refund.  The Receiver has requested that Kowalewski turn the refund over to the Receiver when it is received.

70.    ***Current Liabilities.***  The Receiver's investigation into Kowalewski's liabilities is ongoing.  To date, the Receiver has identified the liabilities referenced below as belonging to Kowalewski.

a.    ***McNairy Pointe Guaranty.***  Kowalewski is a personal guarantor of an outstanding note to SunTrust Bank in excess of $3 million for the McNairy Pointe property, as discussed above.

b.    ***2010 Taxes.***  Kowalewski may have tax liability arising from his income in 2010.  Unless directed otherwise by the Court, the Receiver will not file Kowalewski's income tax return, and the filing of the return as well as any tax liability will remain Kowalewski's responsibility.

## PLAN OF DISTRIBUTION

71.    As indicated above, the Receiver Team has taken the necessary steps to assure that the Receiver is in a position to exercise necessary and appropriate direction and control over the management of the SJK Funds.

72.    Distributions to investors will be made in accordance with a Plan of Distribution approved by this Court.  While there are a few critical issues that require additional investigation and which could affect the treatment of specific

investors or assets, the Receiver is able to provide a fairly detailed description of how he and the Receiver Team envision that distributions will be made and expenses will be paid in connection with this receivership.

73.     The Receiver expects that he will be in a position to file a motion seeking approval of a proposed Plan of Distribution in the near future, so that distributions can be made when monies become available as a result of redemptions of investments in third-party hedge funds.  In sum, the Receiver will administer the SJK Funds in accordance with the existing structure and governance, with the ultimate objective of redeeming all investors' interests in the SJK Funds simultaneously.

74.     In all likelihood, there will be more than one distribution to investors in the SJK Funds, beginning in or about July 2011; however, the Receiver will explore the possibility of earlier incremental distributions depending on timing of the redemption of the SJK Funds' investments with third-party funds.

75.     The Receiver expects that the proposed Plan of Distribution will be structured as follows:

76.     With respect to the GPA investments, the Receiver intends to work with GPA and its counsel to:  (a) transfer some or all of the accounts to a successor investment adviser and manager, and/or (b) liquidate some or all of its investment

accounts and disburse the proceeds, net of expenses, to GPA.  The Receiver's current expectation is that management fees owed to SJK in connection with these accounts will be paid to SJK in accordance with controlling agreement(s) and/or the historical course of conduct.

## SJK

77.     Currently, the Receiver intends to keep the assets of SJK and liabilities of SJK separate from those of the SJK Funds, including the Special Opportunities Fund.  The Receiver's proposed disposition of assets and liabilities of SJK will be part of the Receiver's distribution plan.

## Special Opportunities Fund

78.     As indicated in a motion filed contemporaneously with the filing of this Report, the Receiver believes that it is appropriate to include the Special Opportunities Fund as an entity in the receivership.  In light of the factual circumstances of this case, this will allow for the most fair and efficient recovery and distribution of assets and other monies, along with allocation of expenses of the receivership.

79.     As described above, the assets of the Special Opportunities Fund are in the process of being liquidated.  The net proceeds of the Receiver's liquidation

efforts will be maintained in the Special Opportunities Fund, pending further distribution.

80.     Except as specifically described below, the professional fees and other expenses of the receivership shall be paid from the assets in SJK and the Special Opportunities Fund.

81.     The cash and other proceeds of the liquidation of the assets in or transferred to the Special Opportunities Fund will be distributed to the investors in that fund on a pro rata basis.  The distributions to the Onshore Absolute Return Fund and Offshore Absolute Return Fund will be managed and distributed to investors of those Funds in the same manner as other assets of those two Funds. Any distribution to Kowalewski, individually (or his wife), will be held in escrow pending the resolution or final adjudication of the instant civil action.

82.     There may be one or more distributions from the Special Opportunities Fund.  The Receiver shall have sole and absolute discretion to determine amount and timing of any interim distribution from the fund.

### The Other SJK Funds

83.     The four other SJK Funds – i.e., the Offshore Absolute Return Fund, the Onshore Absolute Return Fund, the Offshore Long/Short Equity Fund, and the Onshore Long/Short Equity Fund, LLC – will be administered and investors'

interests redeemed in accordance with the governing documents of each fund, subject to the following conditions:

- No new investments in any of the funds will be allowed.

- All redemption requests of individual investors in the funds will be suspended and the Receiver will give notice of the suspension to all investors.

- The interest of the investors in each fund shall be redeemed simultaneously.

- Any distribution to Kowalewski, individually, (or his wife) will be held in escrow pending the resolution or final adjudication of the instant civil action.

84.     As indicated above, the Offshore Absolute Return Fund and Offshore Long/Short Equity Fund are organized and governed pursuant to the laws of the Cayman Islands.  The Receiver and his counsel are working with Cayman Islands counsel for the Funds to inform the Cayman Monetary Authority of this proceeding and this proposed Plan of Distribution.

85.     The Receiver has begun the process for redeeming investments in all third-party hedge funds.  Redemption notice requirements from the third-party funds range from 30 days notice and month-end redemption to 91 days notice and quarter-end redemption.  Thus, it currently appears that redemption payments likely will be received by the various SJK Funds over the next several months. Importantly, some or all of the third-party hedge funds may have the right to

withhold a portion of the amounts to be redeemed until 2012.  For example, certain

funds may have the right to retain a portion of the redemption amount until after

the completion of the fund's audit for the current year (i.e., 2011), which will not

occur until next year.

86.     When the redemption payments from third-party funds have been

received by the individual SJK Funds, distributions will be made to investors in

those funds in accordance with the controlling agreements and governing law

applicable to each fund.

87.     Professional fees and other expenses of the individual SJK Funds,

including the fees and expenses of the Receiver Team related to activities

attributable to each Fund, will be paid in accordance with the controlling

agreements and governing law applicable to each Fund.

88.     The first distributions to investors likely will occur in or about July

2011.  Given the structure of the SJK Funds, most distribution payments to

investors will be made by the Onshore and Offshore Absolute Return Funds.

89.     Additional distributions will be made, as appropriate, until such time

as all assets, including those included in the SJK Special Opportunities Fund, have

been liquidated and distributed as set forth herein.  Each of the SJK Funds will be

dissolved when all of its investments have been redeemed, its expenses paid, and distributions made to investors in the fund.

## ONGOING ADMINISTRATION AND INVESTIGATION

90.     Before the Receiver can file his motion seeking approval of a Plan of Distribution, the Receiver Team must conclude its factual and legal analysis of issues that could affect whether tracing should be applied to certain investments in the SJK Funds.  Based on the information and documents reviewed to date, it does not appear that tracing of investments will be possible and/or practicable.

91.     The Receiver is working with realtors to sell the Pawley's Island beach house and to generate rental income in the meantime.  The Receiver also intends to list the real property owned by SJK.

92.     The Receiver Team continues to analyze the real property and real estate projects in Greensboro to determine the value, if any, of the Special Opportunities Fund's investment in CDLD and McNeely LLC.

93.     The Receiver Team is in discussions with Combs to determine the amount of potential recovery to the Special Opportunities Fund on the $600,000 secured loan and the recovery by SJK of all or part of the construction deposit it paid to Combs.

94.     The Receiver's investigation of the Special Opportunity Fund's investment in J. Destiny is ongoing.

95.     The Receiver's investigation of Kowalewski's $100,000 withdrawal from an account in his name at First Citizens Bank on January 7, 2011, including potential recoveries from the bank, is ongoing.

96.     The Receiver and his counsel will analyze whether there are claims against third-parties that could result in meaningful recovery to the Receiver Estate, and to determine whether or not such claims will likely be of benefit to investors and other creditors of the Receiver Estate.

97.     In connection with analyzing potential third-party recoveries and other issues in this receivership, it may be necessary for the Receiver to review and analyze electronically stored information recovered from SJK, including four laptop computers and two servers.  The Receiver Team is determining the potential costs and benefits of reviewing different categories of information.

## PROFESSIONAL FEES AND EXPENSES

98.     The Receiver and the professionals working with him are well aware that the fees and expenses associated with the administration of the receivership are paid from the assets of the Receiver Estate.  The goal of all involved is to

conclude this receivership as quickly and efficiently as can be reasonably accomplished.

99.     Prior to the Receiver's appointment, the Receiver Team submitted a proposed fee structure, which included a discount from the professionals' standard market rates and a $500,000 cap for their professional fees incurred in connection with "core receiver functions."  While this case is more complicated than it appeared at the time of the proposal, the Receiver Team remains optimistic that these core functions can be accomplished within the fee cap.  Clearly, there are "extraordinary activities" (as contemplated in the proposal) that are not within the cap.  The Receiver Team has established a billing regimen that will assist the Court, the parties, and investors in determining how the Receiver Team is allocating its time for billing purposes between "core" and "extraordinary" activities.

100.    As with all receiverships, the earliest phase is labor intensive, requiring significant time and effort from multiple professionals.  As of February 28, 2011, the total professional fees incurred are approximately $230,000.  Most of these fees relate to "core" work.

101.   As provided for in the Receivership Order, the Receiver and the professionals working with him will apply to the Court for approval to pay professional fees and expenses.

102.   As indicated above, there are a number of complicated issues that must be addressed in order for this to occur.  In making decisions about how to proceed, the Receiver will consider the cost and the likely benefit associated with most activities although it is important to understand that there are certain activities that must be undertaken regardless of the cost.

Respectfully submitted, this 3rd day of March, 2011.

/s/ *J. David Dantzler, Jr.*
J. David Dantzler, Jr.
Georgia Bar No. 205125
david.dantzler@troutmansanders.com
Thomas B. Bosch
Georgia Bar No. 068740
tom.bosch@troutmansanders.com
Charles R. Burnett
Georgia Bar No. 396397
charles.burnett@troutmansanders.com

**TROUTMAN SANDERS LLP**
5200 Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, GA  30308-2216
(404) 885-3000 (phone)
(404) 885-3900 (fax)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing **RECEIVER'S FIRST INTERIM REPORT** was electronically filed with the Clerk of Court using the CM/ECF system, which automatically serves notification of such filing to all counsel of record.

This 3rd day of March, 2011.

*/s/ J. David Dantzler, Jr.*
J. David Dantzler, Jr.
Georgia Bar No. 205125
