IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | CIVIL ACTION NO. 1:11-cv-0056-TCB |
| vs. | |
| STANLEY J. KOWALEWSKI and SJK INVESTMENT MANAGEMENT, LLC, | |
| Defendants. | |

**RECEIVER'S NOTICE OF CONCLUSION OF RECEIVERSHIP,
FINAL REPORT, FINAL ACCOUNTING,
MOTION TO REOPEN CASE, AND
<u>MOTION TO TERMINATE RECEIVERSHIP</u>**

S. Gregory Hays, Receiver for Defendants SJK Investment Management,

LLC and the SJK Special Opportunities Fund, LP, files this Final Report, Final

Accounting, Motion to Reopen Case, and Motion to Terminate Receivership (the

"<u>Final Report</u>") and shows the Court as follows:

**I.    <u>BACKGROUND</u>**

1.    The Securities and Exchange Commission (the "<u>SEC</u>") filed the

above-styled enforcement action (the "<u>Enforcement Action</u>") on January 6, 2011.

2.      Pursuant to Orders dated February 2, 2011 [ECF No. 37] and March

8, 2011 [ECF No. 59] (the "Receivership Orders"), S. Gregory Hays was appointed

as Receiver for Stanley J. Kowalewski ("Kowalewski"),  SJK Investment

Management, LLC ("SJK"), the SJK Special Opportunities Fund, LP (the "Special

Opportunities Fund"), and all of their assets.

3.      The receivership over Kowalewski and his assets was terminated on

September 30, 2011 by a Consent Order on Receiver's Motion for Turn-Over and

Accounting and Termination of Receivership of Stanley J. Kowalewski [ECF No.

138].  SJK, the Special Opportunities Fund, and their assets are referred to

collectively as the "Receiver Estate".

4.      The Court entered an Order Permanently Enjoining Defendant

Kowalewski and Ordering Other Relief on June 29, 2011 [ECF No. 101],

Permanent Injunctions as to Defendant SJK Investment Management, LLC on

September 23, 2011 [ECF No. 131], and an Amended Final Judgment Imposing

Disgorgement and Civil Penalties against Kowalewski on August 28, 2012 [ECF

No. 184].

5.      On April 18, 2013, the Court entered an Order Administratively

Closing SEC Enforcement Action [ECF No. 192] (the "Administrative Close

Order"), in which it administratively closed this action but granted the Receiver

2

continuing authority to act as receiver.  Paragraph 6 of the Administrative Close

Order provides:

> Upon the conclusion of all activities in this receivership,
> the Receiver shall file a notice and motion to reopen at
> which time the action will be reopened for the final
> administration of the Receiver Estate, which shall
> include, among other things, a final accounting by the
> Receiver of the Receiver Estate, a request for any relief
> required in order to close the receivership and dissolve
> the Receiver Estate, and the final closing of this action
> and the receivership.

6.     As set forth below, the activities in the receivership have concluded.

Accordingly, the Receiver seeks to terminate the receivership.

## II.     <u>SUMMARY OF RECEIVERSHIP ACTIVITIES</u>

7.      While this case involved a single receivership, it was, from a time,

expense, and administration perspective, akin to several significant matters.

8.     Prior to his appointment, the Receiver expected the receivership to

involve the relatively straightforward liquidation and distribution from the

Receiver Estate and from four hedge funds that were managed by SJK:  (1) the

SJK Absolute Return Fund, Ltd. (the "<u>Offshore Absolute Return Fund</u>"); the SJK

Absolute Return Fund, LLC (the "<u>Onshore Absolute Return Fund</u>"); the SJK

Long/Short Equity Fund, Ltd. (the "<u>Offshore Long/Short Equity Fund</u>"); and the

SJK Long/Short Equity Fund, LLC (the "Onshore Long/Short Equity Fund").
Collectively, these four funds are referred to as the "SJK Funds."

9.     The SJK Funds and their governance, assets, investors, and
administration are described more fully in prior filings, including the Receiver's
First Interim Report [ECF No. 55] and the Receiver's Investor Distribution Plan
[ECF No. 102-1].  Because the SJK Funds were managed by Kowalewski and SJK
and the Onshore Absolute Return Fund and Offshore Absolute Return Fund had
made substantial transfers to the Special Opportunities Fund, the management and
liquidation of the SJK Funds was integral to the administration of the Receiver
Estate.

10.     Upon his appointment, the Receiver retained the financial consulting
firm of Hays Financial Consulting, LLC ("HFC") as his accountants and financial
consultants and the law firm of Troutman Sanders LLP ("Troutman Sanders") as
counsel to the Receiver.  The Receiver, HFC, and Troutman Sanders are referred to
collectively as the "Receiver Team."

11.     After the Receiver's appointment, the Receiver Team discovered that
the receivership was significantly more complex than originally expected, due to a
number of factors, including, but not limited to, the following:

- The post-Receivership activities of Kowalewski and affiliated individuals and entities caused myriad problems for the Receiver and the SEC.  For example, Kowalewski gutted his residence of valuable assets and fixtures, which not only reduced the value of the Receiver Estate, but also caused the Receiver Estate to incur substantial additional professional fees and expenses;

- The assets of the Special Opportunities Fund were not only worth significantly less than previously represented by SJK and Kowalewski, several were subject to various ownership agreements and loans that required resolution prior to their disposition;

- The Receiver originally was appointed as receiver over Kowalewski, individually, which presented unique and difficult issues regarding potential tax liability;

- Real Estate and other assets were not held free and clear by the Receiver Estate;

- The administration of the Offshore Absolute Return Fund and Offshore Long/Short Equity Fund required the Receiver Team to coordinate with Cayman Islands counsel to ensure that all work was performed consistent with the requirements of the Cayman Islands Monetary Authority;

- There were issues unique to certain investors that required them to be treated differently than other investors; and,

- Investor and trade creditor claims had to be treated differently due to the various entities at issue and the investment structure of the Special Opportunities Fund and the SJK Funds.

12.    The Receiver's resolution of the issues described above and the other activities of the Receiver and the Receiver Team have been described in various court filings and updates sent directly to investors.  Some of the more substantial

aspects of the receivership and the activities of the Receiver Team are set forth in

the following filings:

- Receiver's First Interim Report, filed on March 3, 2011 [ECF No. 55];

- Receiver's Motion for Approval of Investor Distribution Plan, filed on July 1, 2014 [ECF No. 102];

- Receiver's Motion for Approval of Supplemental Plan for Administration of Receiver Estate and Distribution of Proceeds, filed on June 15, 2012 [ECF No. 174];

- Numerous applications of the Receiver for authority to pay professional fees and to reimburse costs [ECF Nos. 103, 122, 154, 170, 182, 187, 189, 193, 195, 197, 200, 205, 211, 215, and 217]; and

- Various motions and notices filed by the Receiver related to the administration of the Receiver Estate, the settlement of claims, and the sale and disposition of the Receiver Estate's Assets [ECF Nos. 50, 55, 56, 80, 81, 87, 92, 102, 104, 109, 112, 116, 117, 118, 129, 132, 146, 150, 160, 161, 162, 173, 174, 191, 199, 201, 203, 204, 206, 209, and 213].

These prior filings are incorporated herein and this Final Report does not include a

detailed description of the history of this receivership or the activities of the

Receiver Team.

13.    In addition to the information contained in Court filings, the Receiver

Team engaged in frequent formal and informal communications with investors

throughout the course of the receivership.  Among other things, the Receiver Team

communicated to investors as a group on numerous occasions to: (i) update investors regarding the activities of the Receiver Team and the status of the receivership and SJK Funds; (ii) provide updated financial information for SJK, the Special Opportunities Fund, and the SJK Funds; and/or, (iii) request investor actions, consents, and/or waivers in connection with the administration of the Receiver Estate and SJK Funds.

14.     In sum, as demonstrated by the Court filings and explained to investors, the Receiver has administered the Receiver Estate and the SJK Funds in an effort to maintain and, where possible, increase the value of the subject assets for distribution to the investors in the SJK Funds.  Among other things, the Receiver has been able to:

- Avoid disputes over investor claims (*see* Receiver's Investor Distribution Plan [ECF No. 102-1]);

- Address all creditor and employee claims without dispute (*see* Receiver's Plan for Supplemental Plan for Administration of Receiver Estate and Distribution of Proceeds ("Supplemental Plan") [ECF No. 174-1]);

- Proactively manage the receivership to avoid significant potential tax liabilities and other liabilities of Kowalewski and the Receiver Estate;

- Work with Cayman Islands counsel and the independent director of the Offshore Absolute Return Fund and Offshore Long/Short Equity Fund to avoid parallel proceedings by the Cayman Islands Monetary Authority;

- Avoid audit fees for 2011 and subsequent years; and

- Obtain significant recoveries from Kowalewski and third parties (*see, e.g.,* September 30, 2011 Consent Order on Receiver's Motion for Turn-Over and Accounting and Termination of Receivership of Stanley J. Kowaleski [ECF No. 138]; December 18, 2013 Notice of Settlement and Recovery of $100,000 for the Receiver Estate; March 3, 2014 Notice of Settlement [ECF No. 199]).

15. As a result of the Receiver's efforts, the SJK Funds and the Receiver Estate have distributed over $65.3 million to third-party investors in the SJK Funds and the Special Opportunities Fund pursuant to the terms of the Receiver's Investor Distribution Plan.  Moreover, under the Receiver's Supplemental Plan, the Receiver resolved $1.7 million in creditor and employee claims against the Receiver Estate and paid $96,451 in complete satisfaction of all approved creditor and employee claims.

16. The Receiver Team has concluded all activities necessary to close the Receiver Estate and terminate the receivership.  Among other things, the Receiver recently has completed and filed all necessary tax returns for the Receiver Estate and the SJK Funds.  With the filing of this Final Report, and upon the completion of the limited amount of follow-up work described herein, the Receiver seeks to terminate the receivership.

## III.   WINDING UP THE SJK FUNDS

17.     In the paragraphs below, the Receiver provides a high level overview of the activities engaged in by the Receiver Team in recent months to liquidate the SJK Funds and prepare the receivership for termination.

### A.     Liquidation and Termination of SJK Funds

18.     Beginning in October 2014 and continuing through May 2015, the Receiver Team engaged in various activities necessary to accomplish the formal liquidation and termination of the SJK Funds.   Other than the formal dissolution of the Onshore Absolute Return Fund, the Receiver has no more obligations with respect to the SJK Funds.  Indeed, all investors' interests in the SJK Funds have been redeemed and the SJK Funds and the Special Opportunities Fund have made final distributions to their investors.

#### 1.     Offshore Funds

19.     Because they were Cayman Islands entities, the Offshore Funds were required to complete their liquidation under Cayman Islands law.  Liquidation under Cayman Islands law is a formal process by which a liquidator is appointed to: (i) realize any remaining assets of the entity in liquidation; (ii) apply any assets to the payment of any outstanding debt and distribute surplus assets to shareholders; and, (iii) achieve the formal dissolution of the entity.

20.     Here, the Receiver worked with the Offshore Funds' Cayman Island counsel and their independent director to accomplish the vast majority of the Funds' pre-liquidation administration – including liquidation of assets, payment of debts, and final distributions to shareholders – prior to the initiation of formal liquidation proceedings.  These pre-liquidation activities ensured that the dissolution of each Offshore Fund would be a relatively straightforward administrative process.

21.     Upon the completion of the pre-liquidation administration, each Offshore Fund appointed DMS Corporate Services, Ltd., ("DMS"), an entity affiliated with David Bree (the independent director of the Offshore Funds), to serve as its liquidator.  The liquidation and termination of the Offshore Long/Short Equity Fund was completed on April 20, 2015 and the liquidation and termination of the Offshore Absolute Return Fund is in process.  The remaining activities necessary to complete the liquidation of the Offshore Absolute Return Fund are being performed by DMS, and the Receiver has no more obligations in connection with the liquidation.

## 2.     Onshore Funds.

22.     Both of the Onshore Funds were Delaware entities.

10

23.     The Receiver Team completed the liquidation and termination of the Onshore Long/Short Equity Fund on December 15, 2014.

24.     The timely and efficient liquidation and termination of the Onshore Absolute Return Fund required investors to waive certain pre-liquidation activities. The Receiver sought these waivers in December 2014 and, upon the receipt of waivers from all investors, worked towards the liquidation of the Onshore Absolute Return Fund.  All actions required prior to the dissolution of the Onshore Absolute Return Fund have now been completed, and the Receiver anticipates formally dissolving the Onshore Absolute Return Fund within thirty (30) days of the filing of this Final Report.

**B.     Final Distributions to Investors in the SJK Funds and Special Opportunities Fund**

25.     In connection with the liquidation and termination of the SJK Funds, the SJK Funds and the Special Opportunities Fund made final distributions to their investors.  Specifically:

- The Offshore Absolute Return Fund made a final distribution of $2,561,796, raising the total amount of its distributions to third party investors to $33,741,773.

- The Onshore Absolute Return Fund made a final distribution of $678,440, raising the total amount of its distributions to third party investors to $17,919,437.

11

- The Offshore Long/Short Equity Fund made a final distribution of $2,689, raising the total amount of its distributions to third party investors to $13,451,940.[1]

- The Special Opportunities Fund made a final distribution of $164,789, raising the total amount of its distributions to third party investors to $249,822.[2]

26.    Upon the conclusion of these final distributions, the only remaining asset in the Receiver Estate consists of $118,542.26 in cash.  As addressed in Paragraph 47 below, this amount is necessary to cover previously incurred professional fees and expenses and to create a small reserve for professional fees and expenses and other expenses incurred in connection with the termination activities occurring subsequent to April 30, 2015, which is the end of the period covered by the Receiver's final fee application.

---

[1] The Onshore Long/Short Equity Fund did not have any third-party investors.  It was owned by the Onshore Absolute Return Fund and Special Opportunities Fund and, therefore, its assets were distributed to those funds prior to distribution to third-party investors.

[2] The Special Opportunities Fund was owned primarily by the Offshore Absolute Return Fund and Onshore Absolute Return Fund.  Accordingly, the majority of its assets were distributed to these funds, which in turn, made distributions to their third-party investors.  Thus, although the amounts distributed from the Special Opportunities Fund directly to investors was only $249,822, the Special Opportunities Fund also distributed almost $5 million to the Absolute Return Funds, all of which was distributed by those funds to their third-party investors.

IV.   **FINAL ACCOUNTING**

27.    Attached hereto as Exhibits A through F are final accountings for

SJK, the Special Opportunities Fund, and each of the four SJK Funds.

28.    SJK and the Special Opportunities Fund make up the Receiver Estate.

The four SJK Funds are not part of the Receiver Estate; however, an accounting for

each SJK Fund is included because the Onshore Absolute Return Fund and

Onshore Long/Short Equity Fund (collectively, the "Onshore Funds") were

managed by the Receiver in his capacity as receiver for SJK, which was the

managing member of the Onshore Funds, and the Offshore Absolute Return Fund

and Offshore Long/Short Equity Fund (the "Offshore Funds") were managed by

the Receiver and their independent director David Bree.[3]  Moreover, accountings

for the SJK Funds are appropriate because a significant amount of the assets that

were misappropriated from the Onshore Absolute Return Fund and Offshore

Absolute Return Fund were initially transferred to the Special Opportunities Fund.

29.    The following paragraphs contain explanations of and additional

context for some of the information included in the final accountings.

---

[3] In order to participate in the management of the Offshore Funds and avoid
parallel liquidation proceedings in the Cayman Islands, the Receiver agreed to
serve as a director of each Fund, replacing Kowalewski, which added additional
unexpected complexity to the Receiver Team's work.

A.    **SJK and the Special Opportunities Fund**

30.    As stated above, the Receiver Estate is comprised of SJK, the Special Opportunities Fund, and their assets.

31.    At the time of his appointment, the vast majority of the Receiver Estate's assets were held by the Special Opportunities Fund (or held directly by Kowalewski and subsequently transferred to the Special Opportunities Fund). Further, the limited number of assets that were held by SJK were acquired with investor funds that had been misappropriated or otherwise transferred from the Special Opportunities Fund.  Thus, as explained below, the bulk of the receivership activities are accounted for in the Special Opportunities Fund's accounting.

32.    In December 2011, to aid in and simplify the administration of the Receiver Estate, the Receiver transferred the remaining assets titled in the name of SJK to the Special Opportunities Fund.  These assets consisted of a parcel of land and approximately $318,000 in cash.  Because SJK did not engage in any activity or incur any operating expenses after December 2011, the SJK accounting, attached as Exhibit A, runs from the appointment of the Receiver in February 2011 through December 31, 2011.  This accounting is limited to certain recoveries and operating expenses of SJK during that time period.

33.     Other than the specific recoveries and operating expenses of SJK through December 31, 2011, all other receivership activities, including recoveries, operating expenses, professional fees, and distributions to investors under the Investor Distribution Plan[4] and creditors under the Supplemental Plan[5] are accounted for in the Special Opportunities Fund final accounting, attached as Exhibit B.

34.     As demonstrated by the Special Opportunities Fund final accounting and described below, the Receiver's administration of the Receiver Estate *resulted in a net gain of almost $1 million to the value of the Special Opportunities Fund* after the payment of all operating expenses, the professional fees of the Receiver Team, and other expenses.  The Receiver distributed this net gain to the investors in the Special Opportunities Fund and, ultimately, to the aggrieved investors.

---

[4] Distributions from the Special Opportunities Fund went to its investors: the Offshore Absolute Return Fund, the Onshore Absolute Return Fund, and the Amended and Restated Hickory Springs Retirement Plan.  The amounts distributed to the Offshore Absolute Return Fund and Onshore Absolute Return Fund were then distributed to those Funds' third-party investors.

[5] Under the terms of the Supplemental Plan, a portion of the cash transferred to the Special Opportunities Fund in December 2011 was used to pay approved creditor claims against SJK.  Consequently, all approved claims against the Receiver Estate, including approved claims against SJK, are included in the Special Opportunities Fund accounting.

35.     At the time of the Receiver's appointment, the assets in the Special Opportunities Fund were valued at approximately $4.46 million.  Throughout the course of the receivership, the Receiver sought to preserve and maximize the value of these assets for the benefit of investors and creditors.  For example, early in the receivership, the Receiver elected not to sell the Pawleys Island beach house owned by the Special Opportunities Fund for less than $2.3 million.  Instead, the Receiver held the property, earned approximately $297,000 for the Receiver Estate in rental income, and sold the property for $2.825 million in July 2014.

36.     The Receiver also preserved the assets of the Receiver Estate by minimizing its liabilities.  For example, the Receiver resolved $1.7 million in creditor claims against the Receiver Estate for less than $100,000 in total payments by the Receiver Estate, which also added significantly to the value of the assets available for distribution to investors.

37.     The Receiver also obtained approximately $3.64 million in recoveries from individuals and entities related to the fraud and third parties, which increased the gross value of the Special Opportunities Fund by more than 80%.

38.     The $3.64 million in recoveries more than offset all fees and expenses incurred by the Receiver Estate.  Specifically, during the course of the receivership, the Special Opportunities Fund incurred approximately $687,000 in

operating expenses and the Receiver Estate incurred approximately $2.03 million in professional fees and expenses (including the reserve that the Receiver seeks to establish, which is addressed in Paragraph 47, below).  These fees and expenses represent all of the fees and expenses incurred in connection with work performed by the Receiver Team for the Receiver Estate and the SJK Funds.[6]

39.     The Receiver Team's professional fees are broken out into two categories: (a) Core Administration, which represents services performed for standard receivership activities – *e.g.*, asset disposition, business operations, case administration, claims administration, etc.; and, (b) Extraordinary Activities, which represents services rendered in connection with other activities – *e.g.*, litigation, third party recoveries, tax issues, discovery, certain legal work related to the management and administration of the SJK Funds, etc.  The initial goal was to keep fees for Core Administration activities to $500,000; however, as indicated in numerous fee applications, investor updates, and correspondence with the SEC, and as summarized in this Final Report, both the Core Administration and Extraordinary Activities in this receivership were much more complex and

---

[6] As addressed below, however, the SJK Funds incurred separate fees and expenses in connection with professional services provided directly to them by professionals that were not part of the Receiver Team (*e.g.*, the Offshore Funds' independent director fees and fees paid to Cayman Islands counsel).

required significantly more of the Receiver Team's time and expertise than initially

anticipated.  Moreover, it was often times difficult to allocate the activities

between the two categories.  Accordingly, in September 2011, the Receiver

consulted with the SEC, and the SEC, in light of the complexity of the work

required in connection with the receivership, did not object to payment of fees in

excess of $500,000 for Core Activities.  The Receiver also kept investors apprised

of the unexpected complexities encountered by the Receiver Team and the

resultant increase in fees.

40.     Even though the original fee structure and categorization were not in

line with the actual circumstances of the receivership, the Receiver Team has at all

times been mindful of the overall costs of administering the Receiver Estate and

has performed all of its work with an aim towards maximizing the value of the

Receiver Estate for investors and other creditors.

41.     The Receiver Team also has taken several other measures to reduce

professional fees.  Throughout the course of the receivership, the Receiver's hourly

rate has been discounted by 10% from his standard hourly rate and HFC's rates

have been discounted by 5%.

42.     Moreover, because of the significant amount of legal work done in

this case, Troutman Sanders has provided discounts ranging from 5% for lawyers

with short-term or specialized involvement in the receivership to discounts of more than 40% for more senior attorneys with extensive involvement in the receivership. For example, David Dantzler's rate has been fixed at $495 since the beginning of the receivership, which represents a discount of more than 40% of his current standard rate.  Tom Bosch's rate, which initially was discounted by 5% and then 10%, ultimately was fixed at $459, which represents a discount of almost 25% of his current rate.  In addition, Troutman Sanders made a one-time adjustment of $30,000 to its fees in late 2011 and also represented the Onshore Absolute Return Fund and Offshore Absolute Return Fund on a contingency basis in connection with claims against their former auditor.  As a result of all of these measures, Troutman Sanders has provided the Receiver Estate with hundreds of thousands of dollars in discounts and write-offs.[7]

43.     In sum, the Receiver Team was able to preserve and maximize the value of the assets originally included in the Receiver Estate and recover substantial additional assets during the course of the receivership so that, even after the payment of all operating expenses and professional fees, the Receiver was able to distribute almost $5.3 million from the Special Opportunities Fund.

---

[7] The unexpected complexity of the receivership, the fee structure, and related issues were addressed in various memos to investors and Court filings.  (*See, e.g.,* ECF Nos. 55, 103, 122, 154,170, 195, 197, 200, 205, 211, and 215)

**B.**   **The SJK Funds**

44.   The SJK Funds were not part of the Receiver Estate; however, because the Receiver was involved in the administration of the SJK Funds throughout the course of the receivership, the Receiver has included separate final accountings for each as <u>Exhibits C through F</u>.

45.   None of the Receiver Team's professional fees and expenses were charged directly to or paid by any of the SJK Funds.  The SJK Funds, however, paid other professional expenses, included audit and tax fees.  Because they were Cayman Islands entities, the Offshore Funds also required Cayman Islands counsel, Walkers Global, which had provided legal services to the Offshore Funds since their inception.  Walkers' role was significant in the early stages of the receivership and in connection with the liquidation of the Offshore Funds. Walkers also advised the Offshore Funds on corporate governance and related issues and it was instrumental in avoiding parallel proceedings by the SEC in the United States and the Cayman Islands Monetary Authority in the Cayman Islands. All "Legal Fees" on the Offshore Funds' financial summaries are for legal fees incurred and/or paid by those Funds to Walkers.

46.   During the course of the receivership and under the Receiver's management, the SJK Funds: (a) redeemed all of their investments in third-party

hedge funds; (b) conducted their operations and liquidation in accordance with

Cayman Islands laws and regulations; and (c) distributed over $65 million to their

investors (including funds distributed from the Special Opportunities Fund to the

SJK Funds and then to their investors).

## V.    REMAINING ASSETS IN RECEIVER ESTATE

47.    The SJK Funds all have been liquidated and their investors have been

fully redeemed.  The only remaining asset in the Receiver Estate is $118,542.26 in

cash.  This amount is sufficient to: (a) pay the Receiver Team's professional fees

and expenses incurred from November 1, 2014 through April 30, 2015, which are

reflected in the Receiver's Final Application for Authority to Pay Professional Fees

and Reimburse Expenses, filed contemporaneously herewith; (b) establish a

reserve of $17,138.17, which will be used to pay professional fees and expenses

incurred in connection with the final termination activities engaged in from May 1,

2015 forward, as well as other miscellaneous expenses associated with any final

activities.  Upon the conclusion of all activities, the Receiver will distribute any

remaining reserve to investors consistent with the Investor Distribution Plan.

## VI.    RECEIVER ESTATE RECORDS

48.    Upon the termination of the Receivership, the Receiver no longer will

need any of the Receiver Estate's pre-receivership records, including significant

amounts of electronically-stored information ("ESI").  Accordingly, the Receiver is prepared to destroy pre-receivership records, including ESI, in his possession.

49.     There currently are criminal proceedings pending before Judge Story against Kowalewski and Elizabeth Wood, SJK's former office manager, in a case captioned *United States v. Stanley J. Kowalewski and Elizabeth P. Wood*, Case No. 2:13-cr-45-RWS-JCF, U.S. District Court for the Northern District of Georgia (the "Criminal Action").  The Receiver previously has provided records, including all ESI in the Receiver's database, to the United States Attorney's Office for the Northern District of Georgia.  Because the Criminal Action remains pending, the Receiver will provide notice by electronic mail to all parties of record in the Criminal Action of his intent to destroy all pre-receivership records.  If, within 30 days after the notice is served, the United States Attorney's Office does not request additional records and the Receiver is not otherwise served with a valid subpoena for such records, the Receiver requests that the Court authorize the destruction of all pre-receivership records.  If the United States Attorney's Office requests additional records or if the Receiver is served with a valid subpoena within 30 days of providing the notice, the Receiver requests the authority to turn over the original pre-receivership records in response to such a request or subpoena.

## VII.  **TERMINATION OF THE RECEIVERSHIP**

50.     With the administration of the Receiver Estate and final distributions

to investors and creditors and all other receivership activities complete, it is

appropriate to terminate this receivership.

51.     Accordingly, the Receiver requests that this Court reopen this action

for the final administration of the Receiver Estate and that the Court enter an order:

- Authorizing the Receiver to destroy or turn over the pre-receivership records of the Defendants, subject to compliance with the notice provisions set forth in Paragraph 49 of this Final Report;

- Approving the payment of professional fees and expenses set forth in the Receiver's Final Application for Authority to Pay Professional Fees and Reimburse Expenses; and,

- Authorizing the Receiver to pay professional fees and expenses incurred from May 1, 2015 through the termination of the receivership from the $17,138.17 reserve, and to distribute to investors any unused portions of the reserve upon termination of the receivership.

52.     The Receiver further requests that the Court's order provide that, upon

the completion by the Receiver of all of the activities authorized by the Court, the

Receiver shall file a simple notice with the Court advising that all matters in this

receivership have been concluded and that, upon the filing of the notice and

without the necessity of further order of the Court:

- The receivership shall be terminated;

- The Receiver shall be discharged of all of his obligations under the Receivership Orders, as well as any other duties or obligations incident to his appointment or service as Receiver in this case;

- The Receiver and the Receiver Team shall be discharged and released from any and all claims and causes of action which might be brought against them for matters arising from their administration of the assets turned over to the Receiver, including, without limitation, any claim concerning or relating to the filing of any local, state, or federal tax returns for the Receiver Estate or any of the Defendants herein and/or the reporting of any income, assets, or tax consequences to any person or entity; and,

- The Receiver and the Receiver Team shall be released from any liability to any person or entity for any action taken in good faith in connection with carrying out the procedures set forth in any orders entered in this case or any other actions taken in good faith in connection with the receivership, and providing for payment of defense costs if any such claim is asserted.

53.   A proposed order is attached hereto as Exhibit G.


[Signatures on following page]

This 15th day of June, 2015.

                              /s/ Thomas B. Bosch
                              **J. David Dantzler, Jr.**
                              Georgia Bar No. 205125
                              david.dantzler@troutmansanders.com
                              **Thomas B. Bosch**
                              Georgia Bar No. 068740
                              tom.bosch@troutmansanders.com
                              **Natalie D. Sacha**
                              Georgia Bar No. 558276
                              natalie.sacha@troutmansanders.com

                              **TROUTMAN SANDERS LLP**
                              5200 Bank of America Plaza
                              600 Peachtree Street, N.E.
                              Atlanta, GA  30308-2216
                              (404) 885-3000 (phone)
                              (404) 885-3900 (fax)

                              *Attorneys for S. Gregory Hays, Receiver*

## **CERTIFICATE OF COMPLIANCE OF LOCAL RULE 7.1D**

I hereby certify that the foregoing has been prepared in a Times New Roman 14 point font, one of the font and point selections approved by the Court in Local Rule 5.1B.

*/s/ Thomas B. Bosch*

Thomas B. Bosch

Georgia Bar No. 068740

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing **RECEIVER'S NOTICE OF CONCLUSION OF RECEIVERSHIP, FINAL REPORT, FINAL ACCOUNTING, MOTION TO REOPEN CASE, AND MOTION TO TERMINATE RECEIVERSHIP** was electronically filed with the Clerk of Court using the CM/ECF system, which automatically serves notification of such filing to all counsel of record.

This 15th day of June, 2015.

/s/ *Thomas B. Bosch*
Thomas B. Bosch
Georgia Bar No. 068740

27